**United States District Court**
**Southern District of Ohio**
**Eastern Division**

CDA of America, Inc.,

      Plaintiff,

  v.                                   Case No. C2-01-837
                                              JUDGE SMITH

The Midland Life Insurance Co., et al.,       Magistrate Judge Kemp

      Defendants.

## OPINION AND ORDER

Plaintiff CDA of America, Inc., ("CDA") brings this diversity action against defendants The Midland Life Insurance Company ("Midland"), Ihor Hron, and Dan Flahive. Plaintiff alleges breach of contract, breach of fiduciary duty, misappropriation of trade secrets, civil conspiracy, and aiding and abetting. Plaintiff moves for summary judgment as to liability for breach of contract, breach of fiduciary duty, civil conspiracy, and aiding and abetting. Defendants move for summary judgment on all five claims. For the following reasons, the Court DENIES plaintiff's motion, GRANTS defendants' motion in part, and DENIES defendants' motion in part.

## I. INTRODUCTION

### A. Parties

Plaintiff CDA is a Florida corporation with its principal place of business in Palm Beach, Florida. CDA is registered with the Ohio Secretary of State to do business in Ohio. In the mid 1980s, CDA began to engage in the business of insurance conservation, which is the concept of enticing past or present policyholders to purchase new or additional insurance policies and/or

annuities.  CDA provides independent conservation services for insurance companies, but mostly works in a consultative capacity with companies to help them develop an internal conservation system based upon CDA's own program.  CDA developed its conservation program over a period of fifteen years.  The program consists of a direct marketing system of mailing strategies, employment packages, accounting and marketing methods, actuarial builds, and scripted presentations.  The program is unique in the insurance industry.  CDA relies upon reciprocal confidentiality with its clients to maintain the integrity of its conservation program.

Defendant The Midland Life Insurance Company was a life insurance company with its principal place of business in Columbus, Ohio.  Midland's business consisted of selling term life insurance, whole life insurance, and annuities throughout the United States.  After this lawsuit was filed, Midland was purchased by Swiss Re, a leading global reinsurer, and Midland subsequently became Reassure America Life Insurance Company ("Reassure").  For clarity, the Court will continue to refer to Reassure as Midland.

Defendants Ihor Hron and Dan Flahive were officers of Midland.  Ihor Hron was Midland's president, while Dan Flahive served as second vice president of marketing and business integration.  Dan Flahive also headed Midland's conservation group.

**B.  Facts**

**1.  Marketing Agreement I**

On October 16, 1996, Midland and CDA entered into a "Marketing Agreement" respecting Midland's annuity business ("Marketing Agreement I").  Under the Agreement, CDA agreed to provide annuity retention consulting services in exchange for upfront development fees and marketing overrides.  The total fees Midland was required to pay CDA under the Agreement

2

was $155,000 in various increments. The marketing overrides were compensation based on successful conservation efforts. That is, after CDA installed its conservation program at Midland, CDA would receive compensation based on the program's effectiveness in conserving Midland's business. The Agreement also stated that, at some point, Midland and CDA would jointly develop and market a comprehensive term conservation program. Finally, the Agreement specifically addressed the issue of confidentiality by prohibiting either party from disclosing to any company or person any confidential information under the agreement. The Agreement defined "confidential information" broadly:

> Confidential Information shall mean (1) all information obtained by CDA from Midland or disclosed by Midland to CDA which relates to Midland's product development or business activities, marketing data and statistics, policyholder or agent information and lists or which results from CDA's activities under this Agreement and (2) all information obtained by Midland from CDA or disclosed by CDA to Midland which relates to CDA's business activities, clients or which results from Midland's activities under this Agreement.

(Marketing Agreement I, Art. VI.).

Following the execution of this Agreement, Midland's conservation group, which consisted of three people and whose conservation program up until this point had only included sending out a one page letter and a two page "Question & Answer" leaflet, went to CDA's offices in Florida for training. Later, CDA sent Larry Bahneman, an independent contractor who worked as a CDA consultant, to work with Midland on its conservation efforts. Bahneman reviewed Midland's conservation materials, listened in on Midland's solicitation calls to its policyholders, and became privy to much of Midland's confidential information. Midland developed its annuity conservation program based on CDA's methodologies and the program was generally successful.

**2. Marketing Agreement II**

On September 1, 1997, Midland and CDA entered into a second "Marketing Agreement" concerning the conservation of Midland's term life insurance business ("Marketing Agreement II"). CDA's responsibilities under this second Agreement were virtually identical to those set forth in the first Agreement, except that CDA would provide consulting services for term conservation instead of annuity conservation. This Agreement, like the first one, also called for the payment of marketing overrides to CDA for successful conservation efforts. Moreover, the second agreement contained a confidentiality clause similar to the first one. Finally, the Agreement addressed the "joint venture" between the two parties. Essentially, the parties were to jointly develop a comprehensive conservation program for Midland's term life insurance business. CDA would offer its general knowledge and expertise in the conservation business, and Midland would utilize its knowledge of the term life insurance industry, and together the two parties intended to develop a new unique program of term life insurance conservation. If the program was successful for Midland, CDA would be able to market the program to other companies, and CDA and Midland would split the profits.

**3. Formation of Pivot**

In late 1997, two Midland employees, David Florian and Lou Hensley, decided to leave Midland and start a new company to sell insurance via the internet. The new company was incorporated as Professional Direct Agency, Inc., but is generally referred to as "Pivot." At some point, in order to compliment its internet business, Pivot also sought to perform conservation related services for insurance companies on an outsourced basis. Rather than engaging in training or consulting work, as CDA typically did, Pivot sought to perform services

4

associated with the actual implementation of conservation programs.  In other words, Pivot would do the conservation leg work.  Pivot received a large amount of funding from Midland. Also, several employees were hired from Midland to work for Pivot.

In June 1998, it became apparent to Midland that it did not have the resources to implement its new and improved conservation program.  Also, Pivot was having financial difficulties at that time.  Thereafter, Midland decided to use Pivot to assist in its conservation activities on an outsourced basis.  Midland did not inform CDA of its decision.

**4.  Pivot's Conservation Work for Midland**

Since Pivot would be the party actually doing the conservation work for Midland, Midland shared with them a significant amount of information about its conservation program. In January 1999, Bahneman raised CDA's concerns over the outsourcing to Pivot and inquired about how the confidential information was to pass to Pivot.  As a result of CDA's concerns, Pivot and Midland entered into an agreement addressing Pivot's use of the confidential information.  The agreement stated that Pivot "understands and agrees that The Midland has an existing contractual arrangement with a third party consultant [CDA] who assisted The Midland in developing and implementing a conservation program for annuity and term products" and that "Midland and the third party consultant consider the jointly developed materials in connection with the conservation program to be confidential and proprietary."  (Pl. Mot. Summ. J., Ex. S at 4) (hereinafter "Letter Agreement").  Pivot further agreed that "it will not use any of these materials in connection with any other conservation efforts it may undertake on behalf of other carriers."  Id.

In February 1999, Midland decided to move the remaining components of its

conservation unit to Pivot. Midland did not inform CDA of their decision. When CDA found out about the move, Bahneman again raised CDA's concerns with the disclosure of confidential information to Pivot. In early March 1999, CDA requested that Midland and Pivot immediately cease and desist from any and all conservation activities, return any and all conservation materials, and return all CDA-trained Midland representatives back to Midland. Midland assured CDA of the protections that were in place with regards to CDA information, however, CDA continued to object. In mid-March, Midland transferred its conservation unit back to Midland's premises.

Over the next two years, Pivot performed outsourced conservation work for other insurance carriers. Eventually, because of a lack of profitability, Pivot stopped doing conservation work altogether.

## C. Procedural History

On March 29, 2004, Plaintiff CDA filed an amended complaint (doc. 79) alleging seven claims against five different defendants. On May 28, 2004, plaintiff filed a motion for summary judgment (doc. 96) on the following six claims: (1) breach of contract (against defendant Midland), (2) breach of fiduciary duty (against defendants Midland, Ihor Hron, Dan Flahive), (3) tortious interference with a contract (against defendants Pivot, David Florian), (4) tortious interference with a business relationship (against defendants Pivot, David Florian), (5) civil conspiracy (against all five defendants), and (6) aiding and abetting (against all five defendants).[1] On October 13, 2004, this Court entered an agreed order of dismissal (doc. 131) of all claims against defendants Pivot and David Florian. This resulted in the lapse of plaintiff's two claims

---

[1] Plaintiff does not seek summary judgment on the misappropriation of trade secrets claim.

of tortious interference.  Finally, on November 1, 2004, the remaining defendants, Midland,

Hron, and Flahive, filed a motion for summary judgment (doc. 133) as to all of plaintiff's

remaining five claims.[2]


## II.  STANDARD OF REVIEW

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which

provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party is entitled to
> judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is appropriate,

however, if the opposing party fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the court must draw all reasonable

inferences in favor of the nonmoving party, and must refrain from making credibility

determinations or weighing the evidence.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

---

[2]  The resulting scenario can be summarized as follows: plaintiff CDA currently seeks summary judgment as to liability for the following claims: (1) breach of contract, (2) breach of fiduciary duty, (3) civil conspiracy, and (4) aiding and abetting.  Defendants (Midland, Hron, and Flahive) seek summary judgment as to the above four claims as well as to plaintiff's misappropriation claim.

133, 150-51 (2000).[3]  A court must disregard all evidence favorable to the moving party that a jury would not be required to believe.  Id.  Stated otherwise, a court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses.  Id.

Thus, the Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex, and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989).  The court in Street identified a number of important principles applicable to summary judgment practice as a result of this 'decided change.'  For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment.  Id. at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "'cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  Street at 1479 (quoting Liberty Lobby, 477 U.S. at 257).  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion.  Street at 1479.  It is not sufficient for the nonmoving party merely to "'show that there is some metaphysical doubt as to the material facts.'"  Street at 1479 (quoting Matsushita, 475 U.S. at 586).  Moreover, "[t]he trial court no longer has a duty to search the entire record to establish

---

[3]  Reeves involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial motion for summary judgment under Fed. R. Civ. P 56.  Nonetheless, the standards applying to both types of motion are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the court, having already heard the evidence admitted during trial, considers the record in its entirety. Reeves, 530 U.S. at 150.  This stands in contrast to the procedure for deciding summary judgment in that a District Court will not have heard all the evidence.  Accordingly, the non-moving party has an affirmative duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact; a court need not comb the paper record for the benefit of the moving party.  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).  As such, Reeves did not introduce a "heightened" standard of review for summary judgment motions.

that it is bereft of a genuine issue of material fact." Id. at 1479-80.  That is, the nonmoving party

has an affirmative duty to direct a court's attention to those specific portions of the record upon

which it seeks to rely in creating a genuine issue of material fact.  In re Morris, 260 F.3d 654,

665 (6th Cir. 2001).

## III.  ANALYSIS

### A.  Arbitration Clause

As a preliminary matter, defendants assert plaintiff's failure to seek arbitration pursuant

to the two Agreements results in an abandonment of plaintiff's right to adjudication.  Defendant

Midland raised this very same issue in a previous motion to dismiss (doc. 83).  The Court

rejected the argument in an opinion and order dated October 27, 2004 (doc. 132), and thus will

not revisit the issue.

### B.  Breach of Contract

Plaintiff has asserted breach of contract against defendant Midland arising from

Midland's alleged violation of the confidentiality provisions of the two Marketing Agreements.

Both parties move for summary judgment on this claim.  For the following reasons, the Court

GRANTS defendant Midland's motion for summary judgment on plaintiff's breach of contract

claim.

A plaintiff must prove the following four elements for a successful breach of contract

claim: (1) existence of a binding contract, (2) performance by the plaintiff of his/her contractual

duties, (3) defendant's breach, and (4) damages.  See Tel. Mgmt. Corp. v. Goodyear Tire &

Rubber Co., 2000 WL 222591, at *3 (6th Cir. 2000); Garofalo v. Chicago Title Ins. Co., 661

N.E.2d 218, 226 (Ohio Ct.App. 1995); <u>Nichols v. Chicago Title Ins. Co.</u>, 669 N.E.2d 323, 328

(Ohio Ct.App. 1995).  The absence of evidence on any of the essential elements entitles the

defendant to judgment as a matter of law.  <u>McIe v. Angelica Health Care Servs. Group</u>, App. No.

94CA005916, 1995 WL 243951, *2 (Ohio Ct.App. April 26, 1995).  Defendant Midland does

not dispute the existence of a binding contract.  Therefore, the Court shall examine the remaining

three elements of plaintiff's claim.

**1.  CDA's Performance under the Contract**

Defendant Midland avers that plaintiff failed to adequately perform plaintiff's own duties

under the contract.  Plaintiff responds with the following three arguments: (1) plaintiff's alleged

breach is an affirmative defense that should have been raised in defendant's answer, (2) plaintiff

performed all duties under the contract, and (3) any breach by plaintiff was immaterial and does

not excuse defendant's performance.

Defendant Midland first addressed plaintiff's breach in their  memorandum in opposition

to plaintiff's motion for summary judgment.[4]  (Def. Memo. Opp. at 31).  Federal Rule of Civil

Procedure 8(c) addresses affirmative defenses.  Several affirmative defenses are enumerated in

the rule, many of which apply specifically to breach of contract claims.[5]  A plaintiff's failure to

adequately perform contractual duties is not listed as an affirmative defense.  The Court

acknowledges that rule 8(c) is not intended to be an exhaustive list of affirmative defenses.[6]

However, CDA has offered no authority to support the notion that plaintiff's breach is an

---

[4] Although defendant Midland did not mention plaintiff's breach in their original answer, defendant did raise the issue in their answer to plaintiff's first amended complaint. (Def. Ans. to Am. Compl. ¶ 130).

[5] Some examples are accord and satisfaction, failure of consideration, fraud, illegality, and statute of frauds. Fed. R. Civ. Proc. 8(c).

[6] Even though Rule 8(c) lists several specific affirmative defenses, it also includes "any other matter constituting an avoidance or affirmative defense."  Fed. R. Civ. Proc. 8(c).

affirmative defense.  The only authority CDA cites, <u>Macurdy v. Sikov & Love, P.A.</u>, 894 F.2d

818 (6th Cir. 1990), deals with accord and satisfaction.  In reality, defendant's assertion that

plaintiff failed to perform contractual duties is simply defendant's belief that plaintiff has failed

to prove an essential element of their claim.  It is well established that the "plaintiff has the

burden of proving by a preponderance of the evidence all the elements of a claim for breach of

contract."  <u>Cooper & Pachell v. Haslage</u>, 142 Ohio App.3d 704, 707 (2001).  Therefore, the

Court finds plaintiff's alleged breach is not an affirmative defense.

Defendant Midland alleges plaintiff breached the confidentiality provisions of the

marketing agreements by allowing Midland's confidential information to be disclosed to a third

party.  The Court agrees.  Larry Bahneman testified that he was President of Choice

International, a company to which CDA outsourced some of its consulting services.  (Bahneman

depo. at 41-43).  Essentially, Choice International partnered with CDA to consult with insurance

companies on implementing CDA's conservation program.  Bahneman worked in the capacity as

a consulting partner for CDA from 1996 until he became a CDA employee in 2000.  Bahneman

was intimately involved in the CDA consulting project for Midland.  In fact, he was the main

CDA contact for Midland, even though CDA never informed Midland that Bahneman was not a

CDA employee at that time.

Throughout the relationship between CDA and Midland, Bahneman was exposed to

Midland's confidential information.[7]  For example, Bahneman was exposed to information

regarding Midland's policyholders, as well as lists of Midland's agents.  (Short depo. at 102-05,

---

[7] As will be discussed more fully in the following section, "confidential information" is defined in relevant part as "all information obtained by CDA from Midland or disclosed by Midland to CDA which relates to Midland's product development or business activities, marketing data and statistics, policyholder or agent information and lists or which results from CDA's activities under this Agreement...." (Marketing Agreement I, Art. XI).  The two Agreements' sections on confidential information are almost identical.

133-36).  Furthermore, Bahneman reviewed Midland's conservation materials and personally

observed solicitation calls to Midland's policyholders.  (Mathews depo. at 65-66).  Most

importantly, he learned about the most successful Midland insurance policies.  (Short depo. at

102-05, 133-36).  All of these events occurred while Bahneman was a subcontractor for CDA.[8]

Plaintiff CDA argues that there is no comparison between Larry Bahneman discovering

confidential Midland information and Pivot becoming privy to CDA's confidential information.

However, the Court's duty is not to compare the two situations.  Whether or not CDA's breach

of the marketing agreements was less egregious than Midland's is irrelevant.  The relevant

inquiry is whether or not CDA breached the confidentiality provision of the agreement.  As

previously stated, the Court finds there was such a breach.  Furthermore, CDA's assertion that

they did not breach the contract since Bahneman received the information from Midland rather

than from CDA is equally without merit.  CDA held Bahneman out as an employee, or at the

very least, never informed Midland of Bahneman's status as a subcontractor.  (Short depo. at

135).  Whether CDA or Midland actually gave the confidential information to Bahneman, the

facts demonstrate that CDA was the party ultimately responsible for Bahneman's receipt of the

information.[9]

CDA further argues that if they did breach the contract, which they deny, then their

actions constitute an immaterial, anticipatory breach that does not excuse Midland's

---

[8] Bahneman did not become a CDA employee until around the time CDA initiated this lawsuit.

[9] CDA makes one final argument concerning its reasons for allowing the Midland information to be
disclosed to Bahneman.  CDA claims the disclosure of the information was solely and exclusivley for the purpose of
accomplishing the goals of the marketing agreements.  However, Midland's disclosure of CDA's confidential
information to Pivot was also done for the purpose of accomplishing these very same goals.  And although CDA has
claimed that Pivot could use the confidential information to directly compete with CDA, Bahneman testified that he
also did consulting work for other companies on behalf of CDA.  Therefore, the third parties (Bahneman and Pivot)
each had confidential information that each could have used in their respective businesses.

performance. To the contrary, this case does not deal with the concept of anticipatory repudiation. An anticipatory breach of a contract by a promisor is a "repudiation of his contractual duty before the time fixed in the contract for his performance has arrived." 9 Corbin on Contracts, Interim Ed., § 959. If the repudiation qualifies as a material breach, then the non-breaching party is excused from performing and can initiate a suit for breach of contract.[10] See Waste Mgmt., Inc. v. Rice Danis Indus. Corp., 257 F.Supp.2d 1076, 1084 (S.D.Ohio 2003). In the present case, each party had begun performing their duties under the joint marketing agreements when CDA breached the confidentiality requirements. Yet, CDA states: "Midland's argument that its after-acquired knowledge of an alleged CDA breach operates to retroactively excuse its own breach represents a profound misinterpretation of contract law." (Pl. Memo Opp. at 6). CDA misunderstands Midland's argument, and in bringing up the notion of repudiation, demonstrates its own misinterpretation of contract law. Midland is not claiming excuse of performance based on a repudiation by CDA.[11] Rather, they argue CDA cannot meet an essential element of their claim, which is to prove that plaintiff CDA adequately performed their duties under the contract.

In sum, CDA breached the confidentiality provision of their marketing agreements with Midland and thus has failed to prove an essential element of their breach of contract claim. Accordingly, defendant Midland's motion for summary judgment as to the breach of contract

---

[10] For example, if CDA and Midland had agreed that the joint marketing venture would not start until January, 2006, and CDA then unequivocally informed Midland that they would not perform under the contract, then there would be a repudiation. Midland would not be required to wait until 2006 where they could perform under the contract and then bring a suit against CDA for breach. Their performance would be excused, and they could initiate legal action immediately. See Waste Mgmt., 257 F.Supp.2d at 1084. That type of situation is much different than the current one.

[11] Even if this case did deal with a repudiation, CDA's breach would be considered material. CDA's breach of contract claim against Midland is based on the same confidentiality provision which CDA has violated. In light of this fact, as well as the fact that Choice International performed consulting services for more companies than just Midland, CDA's actions constitute a material breach of the Agreement.

claim is granted.  Nevertheless, in the interest of being complete, the Court will examine the remaining two elements of CDA's claim.

## 2.  Midland's Breach of the Contract

Midland has also breached the confidentiality provisions of the Marketing Agreements. The Agreement between the two parties states that "neither party shall disclose to any company or person such confidential information and both parties shall keep the terms of this Agreement confidential." (Marketing Agreement I, Art. VI.B).  Confidential information is defined in relevant part as "all information obtained by Midland from CDA or disclosed by CDA to Midland which relates to CDA's business activities, clients or which results from Midland's activities under this Agreement." (Marketing Agreement I, Art. VI.A).  Midland's own general counsel, Toby Thompson, further defines the meaning of confidential information: "Midland and [CDA] consider the jointly developed materials in connection with the conservation program to be confidential and proprietary." (Letter Agreement at 4).  Therefore, "confidential information" for purposes of the marketing agreement encompasses a wide range of information including information dealing with the jointly developed conservation program.

CDA has offered more than enough evidence to prove that Midland disclosed confidential information to Pivot.  This confidential information includes: (1) CDA's compensation structure, (2) CDA's projected sales for the conservation unit, (3) conservation related direct mail letters, (4) reports of conservation results, (5) statistical compilations of reasons why customers chose to leave Midland, (6) conservation bonus plan developed by CDA, and (7) copies of conservation related reports.  (Pl. Memo Opp. at 10-12).  Also, at one point, Midland physically relocated its conservation unit to Pivot's office (although it was subsequently

14

moved back after CDA's continued objection).[12]  Id.  Most damaging to Midland's case is Pivot's promise to Midland that it would "not use any of these materials in connection with any other conservation efforts it may undertake on behalf of other carriers."  (Pl. Memo. Opp. at 12); (Letter Agreement at 4).  This agreement, made in response to CDA's concerns over Pivot acquiring confidential information, is evidence in itself of the confidential nature of the conservation information disclosed to Pivot.

Midland argues there was no breach since Pivot agreed to keep the terms of the Marketing Agreements confidential.  However, this argument fails since the breach had already occurred.  The initial disclosure of confidential information was a violation of the Agreements.  Pivot's promise not to further disclose the information not only fails to cure the breach, but acts as further evidence that the information Midland provided Pivot was in fact confidential.[13]

In sum, CDA provides sufficient evidence of Midland's breach of the Agreements through its disclosure of confidential information to Pivot.

**3.  CDA's Damages from Midland's Breach**

Damages are an essential element of a breach of contract claim.  Cleveland v. Sohio Oil Co., App. No. 78860, 2001 WL 1479233 (Ohio Ct.App. Nov. 21, 2001); Doner v. Snapp, 98 Ohio App. 3d 597, 601 (1994).  "Damages must arise as a result of the breach and must

---

[12] The significance of Midland moving their conservation unit to Pivot's premises is that Midland did not have much of a conservation program before the venture with CDA.  In fact, the complete substance of their conservation program before their relationship with CDA was a one page letter and a two page "Question & Answer" leaflet.  This proves that most of Midland's conservation program consisted of CDA's conservation methods and the jointly developed term conservation strategies, and thus was confidential under the Marketing Agreement.  Therefore, when Midland relocated its conservation unit to Pivot, it was essentially relocating a unit that was implementing both CDA's conservation methods and the jointly developed conservation strategies.

[13] Midland also discusses how the idea of insurance conservation is not particularly complex and really consists of writing letters and contacting current customers.  However, Midland's minimizing the complexity and importance of insurance conservation directly contradicts its own actions.  Surely Midland must have thought conservation was challenging enough to justify spending over one hundred thousand dollars on CDA's conservation expertise.

'naturally and necessarily flow' from the breach of contract." <u>Nichols v. Chicago Title Ins. Co.</u>, 669 N.E.2d 323, 328 (Ohio Ct.App. 1995), quoting <u>The Toledo Group, Inc. v. Benton Indus., Inc.</u>, 623 N.E.2d 205, 210-211 (Ohio Ct.App. 1993).

Plaintiff has offered evidence that CDA has in fact suffered damages as a result of Pivot's acquisition of confidential information. For example, Bahneman testified that Pivot had planned to do "a direct mailing of every life insurance company out there on conservation, that they have a conservation program and they can provide that." (Bahneman depo. at 174). Later, he testified that after the problems with Midland and Pivot, CDA started seeing their accounts diminish.[14] (Bahneman depo. at 183). Furthermore, plaintiff submits the report of Heinz E. Ickert detailing plaintiff's damages. (Pl. Mot. Sur-Reply, Ex. B). Defendant Midland, on the other hand, directs this Court's attention to the fact that CDA received all of its fees and compensation under the Agreements, as well as commissions from Midland's successful conservation efforts. Defendant Midland further alleges that CDA cannot prove an actual loss of any customers as a result of Midland's actions. Based on this evidence, genuine issues of material fact exist as to damages.[15]

## C. Breach of Fiduciary Duty

Plaintiff next alleges defendants Midland, Hron, and Flahive breached their fiduciary duties to plaintiff through their actions with Pivot. Defendants respond by denying the existence of any fiduciary relationship and explain that, even if a fiduciary relationship did exist, none of the defendants' actions constitute a breach. All parties move this Court for summary judgment.

---

[14] Plaintiff CDA also claims Midland and Pivot's actions resulted in large legal fees and damage to CDA's reputation, although the Court is not convinced that either of these are as relevant as a reduction in CDA's conservation business.

[15] As a result of plaintiff's own breach though, defendant is entitled to summary judgment on the breach of contract claim and damages are really a non-issue.

16

For the following reasons, both plaintiff and defendants' motions are DENIED.

A successful claim for breach of fiduciary duty requires proof of the following elements: (1) existence of a fiduciary relationship, (2) breach of the fiduciary duty, and (3) an injury proximately caused by the breach. Davis v. DCB Fin. Corp., 259 F.Supp.2d 664, 673 (S.D.Ohio 2003); Hurst v. Enter. Title Agency, Inc., 809 N.E.2d 689, 697 (Ohio Ct.App. 2004).

A fiduciary relationship can be established by entering into a joint venture. "Although the scope of the duty may be less broad, parties to a joint venture, like those in a partnership, owe each other the duties of fiduciaries." Nilavar v. Osbourn, 711 N.E.2d 726, 738 (Ohio Ct.App. 1998); see also Johnson Const. Co. v. Kasydar, 42 Ohio St. 2d 29, 32 (1975) ("It has been the practice of this court, and indeed the practice of most courts, to apply to joint ventures the law which has developed concerning partnerships.") "The joint venture relationship 'imposes a duty of full disclosure between the fellow venturers.... It also imposes a duty against self-dealing or secret advantage.'" DeBoer Structures, Inc. v. Shaffer Tent & Awning, 233 F.Supp.2d 934, 946 (S.D.Ohio 2002).

A joint venture is a "contractual association in which the parties intend to carry out a common business purpose. Id., citing Busler v. D & H Mfg., Inc., 611 N.E.2d 352, 356 (Ohio Ct.App. 1992). More specifically, a joint venture is "an association of persons with intent, whether express or implied, to engage in and carry out a single business venture for joint profit, for which they combine their efforts, property, money, skill and knowledge without creating a partnership." Sylvester Material Co., Inc., v. Envtl. Network & Mgmt. Corp.,No. 13-99-40, 1999 WL 1243209, *1 (Ohio Ct.App. Dec. 23, 1999), quoting L & H Leasing Co v. Dutton, 612 N.E.2d 787 (Ohio Ct.App. 1992). Broken down, a joint venture consists of four elements: (1) an

express or implied joint contract, (2) an actual intent to associate as joint venturers, (3) joint control and community of interest over the enterprise, and (4) a joint sharing of profits and losses among the joint venturers.  <u>Sylvester</u>, 1999 WL 1243209, *2; <u>L & H Leasing</u>, 612 N.E.2d at 790.

The Court finds there is no doubt that the parties entered into a joint venture.  The Agreement calls for Midland and CDA to jointly develop a term conservation program, and if it was successful, they would market the program to other companies and split the revenues.  This section was labeled "Joint Venture."[16]  It called for Midland and CDA to "*jointly develop* a comprehensive conservation program for The Midland's term life insurance business." (Marketing Agreement II, Art. VII) (emphasis added). "On completion, the program may be marketed by CDA to companies approved by The Midland...."  <u>Id.</u>  The two parties "agree[d] to share in any profits generated by the term life insurance program jointly developed by The Midland and CDA and marketed to other companies...."  <u>Id.</u>  The parties' intent to engage in a joint venture is clearly established from this agreement.  CDA and Midland freely entered into the Marketing Agreements setting out the details of the joint venture.  Moreover, the provision was drafted by Midland's own counsel.  Finally, Kevin Short, a Midland Vice President, confirms Midland's intent when he states "the sooner that a reactive term conservation program is established and performing, *the sooner we can provide a well rounded conservation program to other companies*."  (Def. Memo. Opp., Ex. 8 at 2) (hereinafter "Short Letter") (emphasis added).

The record also clearly establishes that there was joint control and community of interest

---

[16] Defendant Midland correctly notes that the headings in the Agreements do not affect the construction or interpretation of the Agreement.  (<u>See</u> Marketing Agreement II, Art. XIII).  However, in determining the parties' intent, the Court does find it somewhat interesting that Midland's general counsel chose these exact words.

over the enterprise.  CDA and Midland worked together on the program and by early 1998 had

already made substantial progress.[17]  Although the program was never fully completed and

actively marketed to other companies, the parties had invested time and effort into developing

the program.  And as the contract states, development of the term conservation program was a

large part of the joint venture.  Finally, the contract is clear that CDA and Midland agreed to

share in the profits from marketing the term conversion program to other insurance carriers.[18]

(Marketing Agreement II, Art. VII).  Defendants' argument that the joint venture was merely

contemplated but never consummated is without merit.[19]  The agreement plainly states the

parties' intentions to engage in a joint venture, and their subsequent actions and statements

validate their intent to develop the program and share in the profits.  And as stated previously,

although never fully completed, the parties engaged in the development phase of the joint

venture.

Plaintiff has offered more than enough evidence to prove Midland breached their

fiduciary duty to CDA.  Midland disclosed confidential CDA information to Pivot.[20]  This action

in itself was a violation of the trust and confidence CDA reposed in Midland.  Also, Midland

actually assisted Pivot in preparing materials to use in their term conservation business.  (Florian

---

[17] For example, they had developed an overview of the program with an outline of the term proactive procedures, term reactive procedures, term telephone scripts, conservation letters for term life policies, and a listing of products to be used in the conversion program.  (Pl. Memo. Opp. at 24).

[18] Defendants rely on the fact that the program was never actually marketed to other companies to prove that it was not a joint venture.  However, even though the parties never earned profits from the program, the agreement proves that the parties had intended to share in the profits once the program had been fully developed and sold.  See L & H Leasing, 612 N.E.2d at 790 (explaining how the fourth requirement for a joint venture is "*an agreement* for the division of the profit and loss.") (emphasis added)

[19] Defendants' argument on this point is essentially one of timing.  How far must a joint project progress in order to qualify as a "joint venture?"  Defendants seem to believe a joint venture cannot exist unless the project itself is totally completed and its goals accomplished.  This Court disagrees, especially since the actual development of the program was an essential part of the venture.

[20] See section III.B.2 of this opinion.

depo. at 87-88) (explaining how Pivot received input from Midland in preparing term conservation materials).  Finally, notwithstanding Midland's argument that CDA received all of its compensation under the marketing Agreement, the record reveals that Midland had planned to join with Pivot in sharing profits from Pivot's other conservation activities.  This is evidenced by the Letter Agreement dated February 1, 1999, which states "if Pivot, after making a good faith attempt to sell a Midland product, determines that the only way to conserve the policy is by writing a policy with another carrier, then Midland will receive 25% of any compensation received by Pivot for the sale of such policy."  (Letter Agreement at 2-3).  Based on all of this evidence, Midland failed to fulfill its duties of good faith and full disclosure, as well as its duty against self dealing.  Midland's other two arguments, that there were sound business reasons for outsourcing to Pivot and that there is no evidence they disclosed CDA materials to Pivot, are both without merit.  There is ample evidence of Midland's disclosure, and although there may have been practical reasons for outsourcing to Pivot, the fact remains that Midland should have disclosed this information to CDA, especially since Pivot also solicited conservation work from other insurance carriers.

Plaintiff has also offered a sufficient amount of evidence concerning defendants Hron and Flahive's involvement in the breach.  Under Ohio law, "a corporate officer and director, can be found personally liable for a tort committed by the corporation under his control, or with his participation or cooperation."  Cent. Benefits Mut. Ins. Co. v. RIS Adm'rs. Agency, Inc., 638 N.E.2d 1049, 1054 (Ohio Ct.App. 1994).  Plaintiff avers that Hron, as President of Midland, was the individual responsible for the decision to outsource Midland's conservation unit to Pivot. Plaintiff further argues that Flahive, as a Midland Vice President and officer in charge of the

20

conservation unit, was directly involved in executing the outsourcing to Pivot. Since part of Midland's breach concerned the disclosure of CDA's information to Pivot through the outsourcing, the Court finds there is enough evidence of Hron and Flahive's involvement in the breach to withstand defendants' motion for summary judgment.[21]

The defendants correctly note that in most respects, CDA's breach of fiduciary duty claim mirrors its claims for breach of contract. For the same reasons this Court found genuine issues of material facts exist as to damages for the breach of contract claim, this Court also finds genuine issues of material fact exist as to CDA's injuries from defendants' breach of fiduciary duties. Put simply, since reasonable minds could differ on this issue in light of the existing evidence, this Court finds it is not appropriate for summary judgment. Accordingly, the Court DENIES both plaintiff and defendants' motions for summary judgment on the claim for breach of fiduciary duty.

### D. Misappropriation of Trade Secrets

Plaintiff alleges defendants Midland, Hron, and Flahive misappropriated plaintiff's trade secret through their actions with Pivot. Defendants move this Court for summary judgment. Defendants argue that plaintiff's conservation program is not a trade secret under Ohio law and defendants did not engage in any improper conduct with regards to plaintiff's program. For the following reasons, defendants' motion is DENIED.

In order to recover damages for a misappropriation of trade secrets claim, a plaintiff must first prove the existence of a "trade secret." State ex rel. Besser v. Ohio State Univ., 89 Ohio

---

[21] Defendants' argument concerning a lack of Hron and Flahive's fiduciary duty toward CDA is misplaced. Plaintiff is not alleging personal liability on the part of Hron and Flahive based on their own fiduciary obligations to CDA. Rather, plaintiff alleges they are liable *as officers of Midland* based on their involvement in the outsourcing and disclosure.

St.3d 396, 400 (2000); <u>Fred Siegel Co., L.P.A. v. Arter & Hadden</u>, 85 Ohio St.3d 171, 181

(1999); <u>State ex rel. Plain Dealer v. Ohio Dep't of Ins.</u>, 80 Ohio St.3d 513, 525 (1997).  Second,

a plaintiff must show that some sort of "improper means" was used in the acquisition, disclosure,

or use of the alleged trade secret.  <u>R.G. Eng'g & Mfg. v. Rance</u>, App. No. 01-CO-12, 2002 WL

31168521, *5 (Ohio Ct.App. Sep. 25, 2002); <u>Meridian Nat'l v. American Commer. Indust.</u>, App.

No. L-00-1056, 2001 WL 85150, *3 (Ohio Ct.App., Feb. 2, 2001).

## 1.  CDA's Conservation Program is a "Trade Secret"

Ohio's Uniform Trade Secrets Act defines a "trade secret" as follows:

"Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D).  The Ohio Supreme Court has offered six factors for courts to

consider in determining whether something qualifies as a "trade secret."  They are: (1) extent to

which the information is known outside the business, (2) extent to which the information is

known inside the business, (3) precautions taken to guard the secrecy of the information, (4) the

value to the holder of the information of its secrecy from competitors, (5) amount of effort and

money expended in obtaining and developing the information, and (6) amount of time and

expense it would take for others to acquire and duplicate the information.  <u>Besser</u>, 89 Ohio St.3d

at 399-400; <u>Plain Dealer</u>, 80 Ohio St.3d at 525.

22

CDA's conservation program could clearly qualify as a trade secret under Ohio law. CDA took several precautions to protect the secrecy of their conservation information.  For example, both Agreements with Midland contained a confidentiality provision prohibiting the disclosure of confidential CDA information to third parties.  Furthermore, when CDA discovered Midland's disclosure of information to Pivot, CDA objected, and ultimately was successful in getting Pivot to sign an agreement saying they would not use CDA's conservation program on any other customers and would not further disclose the information to anyone.  (See Letter Agreement at 4).  Also, CDA derives a clear value from maintaining secrecy as to the specifics of its conservation program.  Defendants correctly note that "[n]early every insurance company engages in some form of business retention."  (Def. Memo. Supp. at 18).  CDA's business relies on companies paying CDA to install CDA's unique program in the insurance carrier's business. If CDA's program is not safeguarded, there would be less demand for their services, and other companies could offer conservation consulting using CDA's unique methodology.  CDA has also indicated that it spent considerable time and effort, over a fifteen year period, developing its insurance conservation program.  Finally, in light of the amount of continual development of the program over the years, it would take other parties a significant amount of time and expense to duplicate the development of CDA's program.

Defendants make several arguments to support their claim that CDA's conservation program is not a trade secret.  First, defendants allege that insurance conservation is not inherently difficult and CDA's program is within the realm of general skills and knowledge. Yet, Midland agreed to pay CDA $155,000 for CDA to install the program, which is evidence in itself of the program's value.  Defendants flatly assert that whether or not another party is willing

23

to pay for a consulting service is not a factor to consider in determining whether or not something is a trade secret. However, the authority they cite, <u>Besser v. Ohio State Univ.</u>, does not stand for this proposition.

Second, defendants aver that CDA's program is a general business practice which cannot qualify as a trade secret. However, the cases defendants rely on are clearly distinguishable from the present case and this argument is without merit.[22]

Finally, defendants aver that CDA's program is nothing more than a marketing concept which cannot qualify as a trade secret. To the contrary, CDA's conservation methods are a detailed set of strategies developed over several years that make up more than a simple "marketing concept."

## 2. Improper Means

CDA has provided sufficient proof that Midland employed improper means in disclosing CDA's conservation information to Pivot. Ohio's Uniform Trade Secrets Act defines "improper means" as follows: "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage though electronic or other means." Ohio Rev. Code § 1333.61(A). This Court has said that Midland breached the confidentiality provisions of the marketing agreements, which clearly qualifies as a breach of a duty to maintain secrecy as to CDA's conservation program.

---

[22] <u>Am. Nursing Care of Toledo, Inc. v. Leisure</u>, 609 F.Supp. 419, 432 (N.D.Ohio 1984), dealt with documents that "[were] merely common business forms for recording generic business information...." Similarly, <u>Water Mgt., Inc. v. Stayanchi</u>, 15 Ohio St.3d 83, 86 (1984), dealt with "general engineering techniques typically known to those in the...field." Neither of these cases deal with anything remotely similar to CDA's conservation program. Defendants also mention <u>Computer Care v. Service Systems Enters., Inc.</u>, 982 F.2d 1063 (7th Cir. 1992). The Circuit Court's own words indicate that <u>Computer Care</u> also deals with a system much different than CDA's: "although a trade secret can exist as a unique combination of otherwise obvious components, the plaintiff's system did not take its individual features and transform them into something not generally known or easily duplicated by the industry." <u>Id.</u> at 1073.

24

For the same reasons this Court finds there is sufficient evidence to withstand defendants' motion for summary judgment on the breach of fiduciary duty claim against Hron and Flahive, the Court also finds there is sufficient evidence of Hron and Flahive's involvement in the misappropriation of CDA's trade secret.  Plaintiff has offered evidence of Hron and Flahive, in their official positions at Midland, participating in improper conduct with regards to the disclosure of CDA's program.

### E.  Conspiracy / Aiding & Abetting

Plaintiff alleges conspiracy and aiding and abetting against defendants Midland, Hron, and Flahive with regards to the misappropriation of plaintiff's trade secrets.  All parties move for summary judgment.  For the following reasons, plaintiff's motion is DENIED, defendants' motion is GRANTED as to the civil conspiracy claim, and defendants' motion is DENIED as to the claim for aiding and abetting.

Plaintiff moves the Court for summary judgment on their conspiracy and aiding and abetting claims, but not on their claim for misappropriation of trade secrets.  A claim of civil conspiracy is based on an underlying unlawful act.  See Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 475 (1998).  Similarly, a claim of aiding and abetting requires an underlying tortious act.  See Aetna Casualty & Surety Co. v. Leahy Constr. Co., Inc., 219 F.3d 519, 533 (6th Cir. 2000).  Since plaintiff does not move for summary judgment on the alleged underlying unlawful act, misappropriation of trade secrets, the Court must deny plaintiff's motion for summary judgment on these two claims.

A claim for civil conspiracy requires proof of the following three elements: (1) a malicious combination of two or more persons, (2) resulting in injury to person or property, and

(3) existence of an unlawful act independent of the conspiracy. Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 419 (1995). A malicious combination to injure means "a common understanding or design, even if tacit, to commit an unlawful act." Gosden v. Louis, 116 Ohio App.3d 195, 219 (1996). Plaintiff CDA has failed to offer sufficient evidence of a malicious combination of the defendants. Plaintiff's claim that defendants conspired to save Midland's investment in Pivot by disclosing CDA's conservation program to Pivot is simply unsupported by the facts. CDA has failed to prove a "common understanding" among defendants.

A claim for aiding and abetting requires proof of the following three elements: "(1) the party whom the defendant aided performed a wrongful act that caused an injury; (2) the defendant must have been generally aware of his role as part of an overall illegal or tortious activity at the time that he provided his assistance; (3) the defendant must have knowingly and substantially assisted the principal violation." Estate of Grace L. Cowling v. Estate of Garnard H. Cowling, Nos. 01CA007944, 03CA008226, 2004 WL 1160168, *14 (Ohio Ct.App. 2004), quoting Guerrero v. C.H.P., Inc., 2001 Ohio App. LEXIS 3603, *11 (2001). Again, this Court finds that plaintiff has offered sufficient evidence that Hron and Flahive, in their official positions at Midland, participated in improper conduct with regards to the disclosure of CDA's conservation program. Accordingly, defendants' motion must be denied.

## IV. DISPOSITION

For all of the foregoing reasons, the Court **DENIES** plaintiff's motion for summary

26

judgment, **GRANTS** defendants' motion for summary judgment in part, and **DENIES** defendants' motion in part.

The Clerk shall remove Docs. 96 & 133 from the Court's pending motions list.

The Court will set a date for trial on the remaining claims.[23]


**IT IS SO ORDERED.**


/s/ George C. Smith
**GEORGE C. SMITH, JUDGE**
United States District Court

---

[23] Plaintiff's remaining claims are (1) Breach of fiduciary duty against Midland, Hron, and Flahive, (2) Misappropriation of trade secrets against Midland, Hron, and Flahive, and (3) Aiding and abetting misappropriation of trade secrets against Midland, Hron, and Flahive.